## COMIND, COMPANHIA DE SEGUROS

### v.

## SIKORSKY AIRCRAFT DIVISION OF UNITED TECHNOLOGIES CORPORATION and United Technologies International, Inc.

### Civ. No. H–82–734 (TEC).

United States District Court,
D. Connecticut.

Jan. 14, 1987.

Opinion on Motion for Reconsideration
July 14, 1987.

Marc S. Moller, Kreindler & Kreindler, New York City, for plaintiff.

John R. Fitzgerald, Howard, Kohn, Sprague & Fitzgerald, Hartford, Conn., for defendants.

## RULING ON THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

CLARIE, Senior District Judge.

The defendants, United Technologies Corporation (UTC) and United Technologies International, Inc. (UTI) move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The Court finds that the defendant UTC is entitled to partial summary judgment on the questions of agency, but that the defendants are not entitled to summary judgment on the other issues they have raised. The motion is therefore granted in part and denied in part.

### *Facts*

The present controversy stems from the crash of a helicopter owned and operated by Votec Servicos Aeros Regional, S.A. (VOTEC), a Brazilian Corporation with its principal place of business in Brazil. The helicopter was insured by Comind, Companhia de Seguros (Comind), also a Brazilian corporation with its principal place of business in Brazil. The defendants, UTI and UTC are both Delaware corporations, with principal places of business in Connecticut.

In September of 1975, VOTEC entered into a sales agreement with UTI to purchase several helicopters made by UTC. On or about September 14, 1979, VOTEC accepted delivery of the helicopter at issue here. VOTEC paid roughly $1,600,000.00 for this helicopter. Subsequently, on March 20, 1980, the helicopter crashed off the coast of Brazil. Approximately 14 deaths resulted and the helicopter was completely destroyed. Comind, VOTEC's insuror, paid VOTEC for the loss of the helicopter. Comind is now suing UTI as the seller, and UTC as the manufacturer of the helicopter, seeking to recover the amount it

paid to VOTEC plus costs and interest. Comind claims complete subrogation rights, and seeks to impose liability on UTI and UTC under a variety of theories.

The evidence available to the Court at this time suggests that the crash was caused by the failure of a small part within the rotary mechanism that held the helicopter's blades in place. This part is known as the "bearing inner race". Neither UTI nor UTC contest Comind's claim that the failure of this part caused the accident (although the ultimate determination of this fact is not now before the Court). Comind has submitted the depositions and technical reports of various UTI and UTC personnel in support of its allegation that the failure of this part caused the accident. A confidential Silorsky report on the accident concludes that "the increased loads caused by the loss of the bearing inner race eventually caused the crack initiation, propagation and fracture of the black spindle on the accident helicopter." Report, Status of Sikorsky's Assessment to Date of VOTEC Spirit Accident on March 20, 1980, p. 20. The report attributes the loss of the bearing inner race to fatigue: specifically, that it cracked and fell off the helicopter, thus allowing the "black spindle" to slip and vibrate and eventually fail. For the purposes of this motion for summary judgment the Court assumes that this indeed was the cause of the accident, and that the part in question was defective.

The plaintiff has made numerous claims arising from its allegation that the helicopter was defective. First, it argues that the defective condition constitutes a breach of warranty; second, it alleges negligence on the part of the defendants; and third, it seeks to impose liability under strict products liability theory. The defendants seek summary judgment on each of Comind's claims, arguing that the sales contract's warranty and tort disclaimer provisions bar such claims. The plaintiff, however, contends that these disclaimer provisions are unenforceable; and, additionally, that even if UTI may enforce the disclaimer provisions, UTC may not since it was not a party to the agreement. UTC argues that UTI acted as its agent in the matter and that it is therefore entitled to enforce the disclaimers on its own behalf.

### Discussion

In a motion for summary judgment, the burden is upon the party seeking it to establish that there remain no genuine issues of material fact and that the moving party is entitled to succeed as a matter of law. Rule 56(c); *Heyman v. Commerce & Industry Insurance Co.*, 524 F.2d 1317, 1319–20 (2d Cir.1975). In considering a summary judgment motion, all inferences drawn from the materials presented must be viewed in a light most favorable to the non-moving party. *Project Release v. Prevost*, 722 F.2d 960, 968 (2d Cir.1983). *See Burtnieks v. City of New York*, 716 F.2d 982, 983–84 (2d Cir.1983) (factual allegations made by the party opposing the motion, if supported, should be regarded as true); *Robertson v. Seidman & Seidman*, 609 F.2d 583, 591 (2d Cir.1979) (summary judgment is inappropriate where conflicting inferences may be reasonably drawn from the facts). Similarly, all factual ambiguities are to be resolved against the moving party. *Project Release*, 722 F.2d at 968. Armed with these rules, the Court turns to the specifics of the issues presented.

### Choice of Law—Agency

■ The present disagreement over 1) whether UTI acted as UTC's agent in entering into the sales agreement with VO-TEC, and 2) whether UTC may claim the benefit of the agreement's disclaimer provisions, both sound in contract. *Appeal of Freeman*, 68 Conn. 533, 540, 37 A. 420 (1897) ("to create an agency is to enter into a contractual relation"). *See* 1 Restatement, Second, Agency § 32, comment a. Connecticut's contract choice-of-law rule, which this Court must apply, *Klaxon Co. v. Stentor Electric Manufacturing Co., Inc.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), provides:

'that the validity and the construction of a contract are determined by the law of the place where the contract was made. But if the contract is to have its operative effect or place of performance in a jurisdiction other than the place where it was entered into, our rule is that the law of the place of operative effect or performance governs its validity and construction.'

*Whitfield v. Empire Mutual Ins. Co.,* 167 Conn. 499, 506, 356 A.2d 139 (1975) (quoting *Breen v. Aetna Casualty & Surety Co.,* 153 Conn. 633, 637, 220 A.2d 254 (1966)). Applying this rule, the Court must determine 1) where the agency contract was made, and 2) where it was to have its operative effect.

■ The fact that a written agency contract between UTI and UTC does not exist complicates this inquiry. However, where, as here, there is no written agreement, the Court may look to the location where the acts giving rise to the agency relationship occurred, and may find that the implied agency contract was made in that location. 2A C.J.S. Agency § 3. *See Seigmann v. Meyer,* 100 F.2d 367, 368 (2d Cir.1938) (L. Hand, J.) ("the creation of an agency is to be determined by the law of the place where the acts take place which are relied upon to create it"). Applying this standard, the Court observes that each of the factors establishing the existence of an agency relationship between UTI and UTC establish that the relationship was created in Connecticut. Of greatest significance is the fact that both corporations are headquartered in Connecticut and coordinate their respective affairs from this State. To the extent that UTC "controls" UTI's activities (one of the most salient indicia of an implied agency relationship) this control appears to be exercised largely within this State. The Court therefore finds, for the purposes of this motion, that the UTI–UTC agency relationship involved in this case arose in Connecticut.

■ Regarding the second aspect of the Court's choice-of-law inquiry, the Court finds that the implied agency relationship, as it relates to this controversy, was substantially a Connecticut performance. The contract that UTI signed with VOTEC provides that Connecticut law is to govern its interpretation and application. Additionally, both sides assume in their briefs that Connecticut law is applicable. The Court finds that, for the purposes of this motion, Connecticut law governs the disposition of the defendants' agency claims.

### Agency

The defendants contend that UTI acted as UTC's agent in entering into the sales contract with VOTEC, and that therefore UTC may take advantage of the contract's disclaimer provisions. They argue that the record clearly establishes the elements necessary for a showing of agency under Connecticut Law. They also argue that there are no genuine issues of material fact with regard to this claim. The Court agrees and finds that summary judgment is appropriate on this issue.

Connecticut courts have adopted the Restatement approach in resolving questions of agency, and apply a three-part test to determine the existence of an implied agency relationship. *Beckenstein v. Potter & Carrier, Inc.,* 191 Conn. 120, 132–33, 464 A.2d 6 (1983). Under this test, the party claiming agency must demonstrate:

'(1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking.'

*Beckenstein,* 191 Conn. at 133, 464 A.2d 6 (quoting *Botticello v. Stefanovicz,* 177 Conn. 22, 25, 411 A.2d 16 (1979) (the burden of proof rests upon the party claiming the agency relationship)). Factors to consider in applying this test include,

whether the alleged principal has the right to direct and control the work of the agent; whether the agent is engaged in a distinct occupation; whether the principal or the agent supplies the 'instrumentalities, tools, and the place of

work'; and the method of paying the agent.

*Id.* at 133, 464 A.2d 6 (quoting 1 Restatement, Second, Agency §§ 14, 220). The Court finds this test applicable to the facts presented and that the defendants have demonstrated each of the required elements of an agency relationship.

Applying the *Beckenstein* test to the present controversy, the Court must first determine whether the alleged principal, UTC, exercised the requisite amount of "control" over the alleged agent, UTI. Control is defined as the "right to control the day-to-day work of the alleged agent." *Beckenstein,* 191 Conn. at 134, 464 A.2d 6. Control does not exist merely because the alleged principal has some contractual right or power over the alleged agent, such as the right to establish the price of goods sold to a contractor, *Id.* at 120, 464 A.2d 6, or the right to control the quality of goods sold by a franchisee. *McLaughlin v. Chicken Delight Inc.,* 164 Conn. 317, 321 A.2d 456 (1973). On the contrary, the element of control exists only in interrelationships of significantly greater complexity.

In reviewing the record for indications of control, the Court looks first to the facts presented by the plaintiff, Comind, and the characterizations that it offers on behalf of its claim that an agency relationship did not exist. Comind begins by characterizing UTI as a wholly autonomous corporate entity. It points out that UTI maintains its own staff, payroll, books and records. Comind claims that these and similar factors demonstrate a sufficient degree of separateness to preclude any finding of agency. The Court finds, however, that Comind's claims are merely conclusory and are therefore insufficient in and of themselves to prevent the defendants' motion. *Project Release,* 722 F.2d at 968.

It is undisputed that UTI is a corporation with an individual identity. Whether or not UTI acted as the agent of UTC in selling the accident aircraft to VOTEC does not, however, turn on such factors as whether UTI maintained its own books. If such were the case no corporation could ever be the agent of another simply by virtue of the fact that it maintains a separate corporate existence. The truth of the matter is that any corporation may be the agent of another, including a subsidiary for its parent. 3 Restatement, Second, Agency § 14m, reporter's notes. The Court finds that even assuming that the facts presented by Comind regarding UTI are true, they do not, as a matter of law, preclude a finding that UTI acted as agent for UTC in the transaction; nor do they raise any genuine issues of material fact with regard to this claim. The facts and questions raised by the plaintiff are therefore not a bar to granting the defendants' motion on this issue. The Court therefore turns to the evidence supporting the defendants' claim in order to determine if the defendants are entitled to judgment on this issue as a matter of law.

The defendants present unrefuted evidence that UTC exercised day-to-day control over UTI. The affidavit of Mr. Bougie, an employee of UTC involved in the UTI–VOTEC transaction, reveals that UTC personnel prepared the UTI–VOTEC sales contract and the amendments thereto; participated in and dominated the negotiations for the contract; prepared invoices on UTI letterhead; arranged for the aircraft's delivery to VOTEC; and prepared the bill of sale. Additionally, UTC had UTI grant it an express power of attorney authorizing UTC personnel to bind UTI to the contract. This evidence is unrefuted and demonstrates that not only did UTC have the right to control UTI's involvement with VOTEC, but that it frequently exercised that right.

Mr. Bougie's affidavit is supported in several ways. First, it is undisputed that UTI is UTC's wholly owned international marketing arm engaged exclusively in the business of selling UTC products to UTC's international customers. Second, UTI exists as a separate corporate entity primarily to secure certain tax advantages offered to corporations engaged exclusively in international sales. Third, Mr. Bougie's deposition does not contradict his affidavit de-

spite cross-examination. And fourth, there is no other evidence that refutes Mr. Bougie's statements.

On motions for summary judgment the Court does not try issues of fact, it merely determines whether there are any issues to be tried. *Heyman v. Commerce & Industry Insurance Co.*, 524 F.2d at 1319–20. Defendants, of course, have the burden of proving control. The Court finds, however, that because defendants' evidence is supported and unrefuted, and because there remains no doubt concerning the nature of UTC's authority over UTI, there exists no genuine issue of material fact with regard to the issue of control. The Court concludes that defendants have met their burden of establishing that UTC controlled UTI for the purposes of determining whether an agency relationship existed.

The other two elements to be considered in determining the existence of an agency relationship under the *Beckenstein* test are whether there existed " 'a manifestation by the principal that the agent will act for him; [and] acceptance by the agent of the undertaking . . . .' " *Beckenstein*, 191 Conn. at 133, 464 A.2d 6. The Court finds that the unrefuted evidence that establishes control also establishes the existence of these two elements. Clearly, in establishing UTI as its international marketing arm, UTC intended UTI to act on its behalf. UTC consistently referred its international clients to UTI when these clients sought to purchase UTC products. Mr. Bougie's deposition reveals that VOTEC's payments to UTI for its purchases were deposited into a UTC account. Additionally, UTI, as a wholly owned subsidiary, was engaged solely in the business of marketing and selling UTC's products. The Court finds that UTC manifested its intent that UTI act as its agent and on its behalf. *See Nowak v. Capitol Motors, Inc.*, 158 Conn. 65, 69, 255 A.2d 845 (1969) (describing the requirements necessary for a finding that the agent had authority to act for its principal).

With regard to the second of these two elements, the Court finds that UTI accepted the role of agent. UTI, of course, as a wholly owned subsidiary had no choice but to accept its role as the international marketing arm of UTC. The unrefuted evidence demonstrates that UTI cooperated with UTC in securing VOTEC's business and with any other request made by UTC. The Court concludes that there can be no other conclusion but that UTI accepted its role as sales agent.

For the foregoing reasons, and in satisfaction of the requirements of summary judgment and of the substantive legal requirements of the law of agency, the Court finds that UTI acted as the agent of UTC with regard to the sales contract entered into by UTI and VOTEC.

In reaching this conclusion, the Court emphasizes the principle that a subsidiary in not necessarily the agent of its parent corporation merely because the parent owns a controlling interest in the subsidiary, 1 Restatement, Second, Agency § 14m, nor merely because the parent exercises some supervisory control over the subsidiary's affairs. The law treats corporations as individual entities, and the Court applies the same standard in the instant controversy as it would if the alleged principal and agent were two individual persons, or a corporation and a person, or two wholly unrelated corporations. In each case, the party alleging the existence of an agency relationship must establish the elements of control and consent. *Beckenstein*, 191 Conn. at 133, 464 A.2d 6. While the fact that the alleged principal owns the alleged agent is evidence entitled to some consideration, 3 Restatement, Second, Agency § 14m, reporter's notes, this factor alone is far from conclusive. *Id.* § 14m. For agency purposes, "control" is not synonomous with ownership.

The Restatement supports this reasoning and states at length:

A special situation arises when two corporations have a permanent connection with each other through ownership by one of a controlling stock interest in the other. . . . Where such a situation exists the stock control gives the parent a power to convert the relationship into

one of agency. *This does not mean that every subsidiary is the agent of its parent;* so to declare would be to destroy the privilege of limited liability obtained by satisfying the incorporation law which permits the subsidiary to be organized. 3 Restatement, Second, Agency § 14m, reporter's notes (emphasis added). The principles of agency, as applied, merely seek to reveal agency relationships where they already exist. Such relationships are created by the actions of the parties involved and are contractual in nature. It is only where the interrelationship of the alleged principal and agent is of a distinctly involved nature, evidencing the peculiar aspects of particularized control and consent as described in detail in the Restatement, that the law will recognize an implied agency relationship. The Court is persuaded that these requirements of proof are adequate to protect the privilege of limited liability from unwarranted erosion. This is especially true in situations like the one at bar where the parties alleging the existence of the agency relationship are the parent and subsidiary corporations themselves.

In addition to recognizing the dangers inherent in an undue reliance on ownership as suggesting control, it is also imperative not to confuse agency theory with the liability rules used in piercing the corporate veil of a subsidiary to reach its parent. Corporate veil and agency law are fundamentally distinct. While corporate veil piercing theories are useful to demonstrate that two purportedly separate entities are, under certain circumstances, in reality the same actor; agency respects the legal and physical separateness of the alleged principal and agent, finding liability on the part of the agent or principal only as an outgrowth of their contractual interrelationship as defined by contractual consent. It is the principal's contractual consent that empowers the agent to act on the principal's behalf and which thereby defines the scope of the agency. This in turn largely defines the principal's potential liability and is fundamentally within the control of the principal.

The Court next turns to the question of whether UTC may claim the benefit of the disclaimer provisions of the UTI–VOTEC contract. In Connecticut the general rule is that "the contract of an agent is in law the contract of the principal." *Robert Lawrence Associates, Inc. v. Del Vecchio,* 178 Conn. 1, 13, 420 A.2d 1142 (1979) (citing 2 Restatement, Second, Agency § 302). *See* C.G.S.A. § 42a–1–201(29), comment 29 (a party to a contract includes a principal acting through its agent). There are several exceptions to this rule, the first of which is that a principal is not bound to the contract, absent ratification, if the agent exceeded its authority in making the contract. *New England Whalers Hockey Club v. Nair,* 1 Conn.App. 680, 684, 474 A.2d 810 (Conn.App.1984) (citing 3 C.J.S. Agency § 362) (agent acting without authority acts on his own responsibility). Also, a principal is not a party if specifically excluded as a party in the contract. 1 Restatement, Second, Agency § 147. Finally, the principal is not entitled to benefit from the contract if the principal was an undisclosed principal hiding behind its agent for fraudulent or dishonest purposes. *Ritch v. Robertson,* 93 Conn. 459, 469–70, 106 A. 509 (1919). Accordingly, the Court inquires first whether UTI, as agent, acted within its authority; second, whether UTC was a fraudulent undisclosed principal; and third, whether UTC was specifically excluded from the contract.

■ With regard to the issue of whether UTI acted within its authority, the Court finds that UTC granted UTI the authority to engage in the transaction at issue, and that UTI acted within its authority in entering into the agreement. *See E. Paul Kovacs & Co. v. Alpert,* 180 Conn. 120, 125, 429 A.2d 829 (1980) (where the agent had authority to make the contract, the principal may be bound thereby); *Zazzaro v. Universal Motors, Inc.,* 124 Conn. 105, 108, 197 A. 884 (1938) (general authority to conduct a transaction includes such authority as is reasonably necessary to accomplish the particulars of the transaction).

The Restatement defines authority as,

the power of the agent to affect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to him.

*Id.* § 7. *See Conte v. Dwan Lincoln-Mercury, Inc.,* 172 Conn. 112, 125, 374 A.2d 144 (1976) (principal may limit the powers of the agent). In other words, the agent's powers flow from and are defined by the particular consent given. Where the consent is not written or otherwise stated with particularity, its nature is to be inferred from the principal's "manifestations of consent", meaning "conduct from which, in light of the circumstances, it is reasonable to infer consent." 1 Restatement, Second, Agency § 7, comment b. Therefore, the Court looks to the conduct of the principal, UTC, to define the scope of UTI's authority in handling UTC's affairs. *Beckenstein,* 191 Conn. at 140, 464 A.2d 6.

The issue of the scope of the agent's authority is closely related to the issue of consent to the agency. *See generally Bank of Montreal v. Gallo,* 3 Conn.App. 268, 276, 487 A.2d 1101 (1985) (the question of whether an agent's conduct was ratified by his principal is closely intertwined with the question of whether the agent's conduct was within the scope of the agency). Factually, whether or not UTI acted within its authority in entering into the sales contract is beyond dispute. It is unrefuted that, at UTC's behest, UTI was engaged exclusively in the business of selling UTC's products, of which the accident aircraft was one. UTI sold such products to UTC's international customers, of which VOTEC was one. Additionally, UTC dominated the transaction itself, supervising each phase and providing not only the product itself, but also many of the documents and personnel necessary to form and complete the transaction. Although the nature and extent of an agent's authority is typically a question of fact, *E. Paul Kovacs & Co. v. Alpert,* 180 Conn. at 126, 429 A.2d 829, a review of the record establishes that the Court's conclusion is supported and unrefuted. The Court therefore finds that UTI acted within its authority in conducting the transaction on behalf of UTC.

With regard to the issue of fraudulent non-disclosure, the Court finds that UTC was a disclosed principal, and as such cannot be accused of hiding its identity for dishonest purposes. As the Restatement explains,

> [i]f, at the time of the transaction conducted by an agent, the other party thereto has notice that the agent is acting for a principal and of the principal's identity, the principal is a disclosed principal.

1 Restatement, Second, Agency § 4. *See Penick v. Frank E. Basil, Inc.,* 579 F.Supp. 160, 164–65 (D.D.C.1984), *affd.,* 744 F.2d 878 (D.C.Cir.1984) (notice requirement fulfilled when the identity of the principal and the fact of the agency relationship are disclosed to the third party). Notice does not have to be in writing, nor does it have to be "actual" notice. As explained in comment d,

> [i]f the manifestations of the principal or agent are such as reasonably to indicate to the other party the identity or existence of the principal, the latter is disclosed or partially disclosed, and this is true although the other party believes that he is dealing with the agent alone.... If the manifestation as to agency is ambiguous, the belief of the other party, if reasonable, is conclusive.

*Id.,* comment d. The contract itself does not disclose that UTC was the principal in the transaction. Nor is the Court aware of any other documents that were shown to VOTEC that state that UTI was acting as the agent of UTC. However, notice may be had by means other than written notice. *See Id.* (source of knowledge immaterial); *Fairfield County National Bank v. De-Michely,* 185 Conn. 463, 471, 441 A.2d 569 (1981) (a writing is not required to validate an otherwise valid agency; an agency may be created by written or spoken words or "other conduct"). The unrefuted evidence reveals that VOTEC knew of UTC's existence and the scope of UTC's control. VOTEC had made other purchases from UTC through UTI in the past, and knew of the

interrelationship between the parent and subsidiary. The Court finds that VOTEC had actual knowledge both of the existence of UTC, and that UTI acted on UTC's behalf.

With regard to the final element, the law presumes that the principal is a party unless explicitly excluded by agreement. *Robert Lawrence Associates Inc.*, 178 Conn. at 13, 14, 420 A.2d 1142 (the unnamed principal is presumed to be a party; the language of the written contract is controlling); 1 Restatement, Second, Agency § 147 (a disclosed principal is a party to the contract "unless otherwise agreed"). The preamble of the contract in question defines the seller of the aircraft as UTI, and the buyer as VOTEC. It makes no mention of UTC as either the principal or as the seller. Comind argues that this suggests that UTC was excluded. However, evidence that the principal was never actually mentioned in the contract, while perhaps indicative of an intent to limit the parties to those actually named, "is not sufficient ... to rebut the inference that a disclosed ... principal is a party to a contract made by his agent." 1 Restatement, Second, Agency § 149, comment a.

Comind also argues that the contract is an "integrated" contract, and that it therefore would be improper to expand the definition of the parties to include UTC. On the contrary, the mere fact that a contract is integrated is insufficient to exclude the principal as a party even where the parties are defined. 1 Restatement, Second, Agency § 154, comment b. While it is true that special rules apply to integrated contracts regarding the use of non-textual evidence to show whether or not the parties intended other than what they actually stated, *see Ruscito v. F–Dyne Electronics Co.*, 177 Conn. 149, 160, 411 A.2d 1371 (1979) (prohibiting the introduction of evidence that conflicts with an exclusive written statement), these rules are inapplicable to the issue presented here. The Court does not presently address the question of the admissability of extrinsic evidence in conflict with the text of an agreement. It deals with the presumption that a principal is in law a party to its agent's contract. The facts demonstrate that the contract contains no language expressly limiting the parties to the named buyer and seller. And as explained in the Restatement,

> under the rule stated in section 149, the fact that the agent appears to be a party and that the principal's name does not appear in the integrated instrument is not sufficient to exclude the principal as a party. The instrument may be so worded, however, as to exclude him.

1 Restatement, Second, Agency § 154, comment b. Furthermore, the fact that the contract is final with regard to some matters is not to be taken as an expression of finality with regard to matters not specifically addressed in the contract. C.G.S.A. § 42a–2–202, comment 1(a). Because the contract does not explicitly exclude UTC as a party, and because it does not mention any express limitations on who may be a party to it, the mere fact that the parties are defined and that the contract is integrated is insufficient as a matter of law to exclude UTC as a party.

Comind next suggests that the express provisions of the contract, in particular the anti-assignment clause, establish that UTC is excluded on the face of the document. The Court is obliged to scrutinize the contract to determine if indeed Comind has raised a genuine issue of interpretation. However, the Court finds that, while it is true that the contract is an integrated agreement, Comind's claim that UTC is expressly excluded by way of the anti-assignment clause is without merit.

An integrated contract is a "writing or writings constituting a final expression of one or more terms of an agreement." 2 Restatement, Second, Contracts § 209. *See Zullo v. Smith*, 179 Conn. 596, 601, 427 A.2d 409 (1980) ("[i]t is axiomatic that a party is entitled to rely upon its written contract as the final integration of its rights and duties"). Furthermore, "[a] completely integrated agreement is an integrated agreement adopted by the parties as a complete and exclusive statement of the

terms of the agreement." 2 Restatement, Second, Contracts § 210. It is for the Court to determine, before reaching any interpretation issue, whether an agreement is completely integrated. *Id.* Here the Court considers the writing itself together with all relevant evidence. *Id.* § 210, comment b.

The UTI–VOTEC contract provides, in pertinent part, that

[t]he terms and conditions herein contained constitute the entire agreement between the parties hereto and shall supercede all previous communications, representations or agreements, either oral or written, between the parties hereto with respect to the subject matter hereof, and no agreement or understanding varying or extending the same will be binding upon either party hereto unless in writing, signed by a duly authorized representative thereof.

Sales Contract, Standard Sales Provisions for VS–76 Helicopters, § 5(c). While it is perhaps true that a writing cannot in and of itself prove its own completeness, the Court finds, after considering all the relevant evidence, that the UTI–VOTEC contract is a completely integrated agreement. *See Robert Lawrence Associates, Inc.*, 178 Conn. at 11, 420 A.2d 1142 ("the determination that an agreement is sufficiently definite is favored").

In interpreting the express provisions of the contract, the Court recognizes that such interpretation is directed to discovering "the meaning of the terms of the writing ... in light of the circumstances [presented]." 2 Restatement, Second, Contracts § 212. *See John F. Epina Realty, Inc. v. Space Realty, Inc.*, 194 Conn. 71, 77–78, 480 A.2d 499 (1984) ("[t]he intention of the parties to a contract is to be determined by a fair and reasonable construction of the language used interpreted in light of the situation of the parties, the circumstances connected with the transaction, the motives of the parties and the purposes which they sought to accomplish"). The Court is also mindful that any interpretation that depends upon a choice

between reasonable inferences drawn from the evidence presented is a question of fact. *Bead Chain Manufacturing Co. v. Saxton Products, Inc.*, 183 Conn. 266, 274–75, 439 A.2d 314 (1981). However, the Court finds that the evidence establishes that the contract does not exclude UTC as a principal, including the anti-assignment clause, and that any claim to the contrary is entirely unsupported. *See Wards Co., Inc. v. Stamford Ridgeway Associates*, 761 F.2d 117, 120 (2d Cir.1985) (under Connecticut law, courts should not create ambiguities where none exist). Furthermore, the Court declines to add such an exclusion to the contract. *Ruscito*, 177 Conn. at 170, 411 A.2d 1371 (courts cannot interpret terms into a contract).

Because the contract does not expressly exclude UTC as a principal, and because the law presumes a principal is a party even if not mentioned in the contract itself (regardless of whether the contract is integrated or not); and further because there is no evidence in the record sufficient to rebut this presumption, the Court concludes that UTC is a proper party to the contract. *See Project Release*, 722 F.2d at 968 (party opposing a summary judgment motion may not rest on mere conclusory allegations or denials).

With regard to whether UTC is entitled to enforce the disclaimer provisions as a defense, Comind argues that UTC has no such right as a matter of law. Comind argues that even if UTC is a principal to the contract it nevertheless may not assert the contract's disclaimer provisions as a defense to Comind's claims. The Court finds that Comind's assertion is without merit.

A principal, as a proper party to a contract, may sue and be sued on that contract. 1 & 2 Restatement, Second, Agency §§ 140, 292. Where the principal is the party bringing the suit, the law treats the action exactly as though the agent had brought the suit, including the preservation on the defendant's behalf of all defenses that the defendant could have brought to bear against the agent. *Robert Lawrence*

*Associates, Inc.*, 178 Conn. at 13, 420 A.2d 1142. Nevertheless, Comind argues that when the principal is the one being sued, it is not entitled to claim any such defenses, including those arising from the contract itself. The Court finds that if Comind were to prevail on this argument, such would create a gross inconsistency within the law of agency. The Court therefore holds that under Connecticut law, where the principal is a proper party to a contract, the principal is entitled to assert the valid provisions of the contract in its defense just as surely as it would be able to assert such provisions if it were the plaintiff. However, it is axiomatic that a party may not enforce an invalid provision. The Court therefore addresses the issue of whether UTC's disclaimer provisions are enforceable in and of themselves.

### The Agreement's Tort Disclaimer and Warranty Limitation Provisions

The plaintiff, Comind, has brought suit against the defendants claiming negligence, breach of warranty, and strict products liability. The defendants raise the provisions of the sales contract, which purport to disclaim or limit all such liability, as an absolute defense. The defendants request summary judgment claiming that these disclaimers and limitations are valid and enforceable as a matter of law, and that no genuine issue of material fact exists regarding their enforceability. Comind claims that each of the disclaimer and limitation provisions are fatally flawed and, accordingly, claims the existence of genuine issues of fact which, if resolved in Comind's favor, would defeat the purported effect of these provisions. The Court finds that there is merit to the plaintiff's claims and therefore denies summary judgment on these issues.

The UTI–VOTEC sales contract provides, in pertinent part:

1. WARRANTIES, REMEDIES AND LIMITATIONS

(a) *Defective Goods*—Seller warrants to Buyer that at the time of delivery the goods sold hereunder will be free from defects in material and manufacture and will conform substantially to Seller's applicable specifications as stipulated in this Agreement. Seller's liability and Buyer's remedy under this warranty are limited to the repair or replacement, at Seller's election, of goods or parts thereof returned to Seller which are shown to Seller's reasonable satisfaction to have been defective; provided that written notice of the defect shall have been given by Buyer to Seller within ninety (90) days after the first operation or use of the goods (or if the goods are installed in new aircraft, within ninety (90) days after acceptance of such aircraft by its first operator) but in no event later than one (1) year after the date of delivery of such goods by Seller. Transportation charges for the return of defective goods to Seller and their reshipment to Buyer and the risk of loss thereof will be borne by Seller only if returned in accordance with written shipping instructions from Seller.

. . . . .

(d) *Exclusive Warranties and Remedies*—THE FOREGOING WARRANTIES ARE EXCLUSIVE AND ARE GIVEN AND ACCEPTED IN LIEU OF (i) ANY AND ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE: AND (ii) ANY OBLIGATION, LIABILITY, RIGHT, CLAIM OR REMEDY IN CONTRACT OR TORT, WHETHER OR NOT ARISING FROM SELLER'S NEGLIGENCE, ACTUAL OR IMPUTED. The remedies of the Buyer shall be limited to those provided herein to the exclusion of any and all other remedies including, without limitation, incidental or consequential damages. No agreement varying or extending the foregoing warranties, remedies or this limitation will be binding upon Seller unless in writing,

signed by a duly authorized officer of Seller.

. . . . . .

### 6. LIABILITY LIMITATION

The sum of One Hundred Thousand Dollars ($100,000.00) with respect to any helicopter or parts purchased under this Agreement and alleged to be the cause of any loss or damage to the Buyer shall be the ceiling limit on Seller's liability, whether founded in contract or tort (including negligence), arising out of, or resulting from (i) this Agreement or the performance or breach thereof, (ii) the design, manufacture, delivery, sale, repair, replacement, or (iii) the use of any such helicopter or the furnishing of any such parts. In no event shall Seller have any liability for any incidental or consequential damages.

Sales Contract, Standard Sales Provisions for VS–76 Helicopters, §§ 1(a) & (d), 6.

UTI and UTC argue that these provisions absolve them of any liability for the loss of the accident aircraft, whether founded in warranty, strict liability, or negligence. Comind argues that these provisions are of no effect under a variety of theories, and that the defendants are indeed liable for the full amount of its loss. The Court will address Comind's warranty, negligence, and strict products liability claims seriatim, concluding that, because of the limited factual record, summary judgment against these claims is inappropriate at this time.

### *The Plaintiff's Warranty Claims*

As the basis for their motion for summary judgment on the issue of contractual liability, the defendants argue that even if the part were defective, the plaintiff is not entitled to sue the defendants for breach of warranty. The defendants point to the express limitations written into the sales agreement, noting that VOTEC failed to give notice of the alleged defect within the 90 day period set out in the contract, such period beginning to run upon delivery of the aircraft. The defendants argue in the alternative that even if Comind were entitled to damages, such would be limited to the repair or replacement of the defective part, with an absolute ceiling on liability of $100,000.00.

As before mentioned, the sales contract at issue stipulates that the contract "shall be interpreted in accordance with the plain English meaning of its terms, and the construction thereof shall be governed by the laws of the State of Connecticut...." Standard Sales Provisions for VS–76 Helicopters, § 5(b). Connecticut has adopted the Uniform Commercial Code (hereinafter "the Code"), and its provisions govern our analysis on this issue. *Conte v. Dwan Lincoln-Mercury, Inc.,* 172 Conn. at 119, 374 A.2d 144. *See* C.G.S.A. § 42a–1–105 (parties may agree as to what law shall govern their contract, and absent a lack of minimum contacts with that jurisdiction, their choice is binding); *Sivell v. Conwed Corp.,* 605 F.Supp. 1265, 1268 (D.Conn. 1985) (under Connecticut law, the manifest intent of the parties is controlling with regard to the issue of choice of law); and § 42a–2–102 (the code applies to transactions in goods).

■ The Code provides for numerous remedies available to buyers of defective goods. Initially, a buyer may reject a tender of goods if the goods are defective, § 42a–2–601, subject to the requirements enumerated in § 42a–2–602 *et seq.* Here, however, VOTEC accepted the helicopter, *see* § 42a–2–606, thus precluding rejection. § 42a–2–607(2). Regardless, a buyer who has accepted defective goods may, pursuant to § 42a–2–608, revoke his previous acceptance if the buyer neither knew nor should have known of the defect at the time of his acceptance, or relied on the seller's assurances that the defect would be cured but such cure was not made within a reasonable time. *Conte v. Dwan Lincoln-Mercury, Inc.,* 172 Conn. at 122, 374 A.2d 144. A rightful revocation of acceptance would entitle the buyer to a refund. § 42a–2–714; *Conte,* at 123, 374 A.2d 144. Alternatively, a buyer may keep defective goods and sue for damages resulting from the non-conformity. § 42a–2–714; *Stelco Industries, Inc. v. Cohen,* 182 Conn. 561,

564, 438 A.2d 759 (1980). *See* § 42a–2–607(3)(a) (buyer must timely notify seller of breach); § 42a–2–608, comment 1 (buyer may both revoke acceptance and sue for breach).

If the buyer choses to sue for damages arising from defects in the goods, he may do so pursuant to any express or implied warranties offered by the seller in the contract. § 42a–2–714. § 42a–2–313 governs the creation of express warranties. In addition to any express warranties, the Code implies the existence of certain "implied" warranties in the agreement unless excluded or modified. *See eg.* § 42a–2–314 (implied warranty of merchantability; implied warranties arising from course of dealing or usage of trade). The defendants point out that the UTI–VOTEC sales agreement excludes all such implied warranties. Generally, contracting parties are free to vary the effect of the Code's provisions, § 42a–1–102(3) (with certain exceptions), and may so modify and exclude the various implied warranties pursuant to § 42a–2–316. *See Standard Structural Steel Co. v. Bethlehem Steel Corp.*, 597 F.Supp. 164, 184 (D.Conn.1984) (Clarie, J.) (implied warranties successfully disclaimed). However, exclusions of implied warranties and limitations on remedies in general, including the adequacy of any express warranties, are subject to the limitations imposed by §§ 42a–2–316, 42a–2–718, and 42a–2–719, and by the section concerning unconscionability, § 42a–2–302. Other limitations imposed by the Code include those provided in § 42a–2–608, comment 4, and § 42a–2–602, comment 1 (both regarding attempts to limit the time period within which a buyer must discover defects for the purposes of rejecting the goods or revoking acceptance). With these and other Code provisions in mind, the Court returns to the defendants' claim that the warranty limitations and remedy disclaimers embodied in the UTI–VOTEC agreement are valid and enforceable.

With regard to VOTEC's right to revoke its acceptance of the goods upon the discovery of a defect, the contract provides,

[t]he remedies of the Buyer shall be limited to those provided herein to the exclusion of any and all other remedies....

§ 1(d). This subsection also provides that the remedies listed as "warranties" in the previous three subsections, § 1(a) (warranties pertaining to defects), § 1(b) (title warranties), and § 1(c) (patent infringement warranties),

ARE EXCLUSIVE AND ARE GIVEN AND ACCEPTED IN LIEU OF ... AND OBLIGATION, LIABILITY, RIGHT, CLAIM OR REMEDY IN CONTRACT....

§ 1(d). The contract makes it clear that VOTEC's right to revoke its acceptance on the basis of any defect in the helicopter was strictly limited to the provisions of §§ 1(a), (b) & (c), of which only § 1(a) concerns the Court here.

With regard to VOTEC's right to claim the benefit of any warranty provision, the contract expressly excludes any implied warranties, including the implied warranty of merchantability and fitness for a particular use. VOTEC's sole warranty entitlements stem from the express warranties delineated in § 1(a) with regard to any remedy for defective goods. Accordingly, as contemplated by the contract, § 1(a) provides VOTEC's sole remedy. This section states:

Seller warrants to Buyer that at the time of delivery the goods sold hereunder will be free from defects in material and manufacture and will conform substantially to Seller's applicable specifications as stipulated in this Agreement. Seller's liability and Buyer's remedy under this warranty are limited to the repair or replacement, at Seller's election, of goods or parts thereof returned to Seller which are shown to Seller's reasonable satisfaction to have been defective; provided that written notice of the defect shall have been given by Buyer to Seller within ninety (90) days after the first operation or use of the goods (or if the goods are installed in new aircraft, within ninety (90) days after acceptance of such aircraft by its first operator) but in no

event later than one (1) year after the date of delivery of such goods by Seller.

This is a classic repair or replacement warranty, and is one which, in conjunction with § 1(d), attempts to preempt all other possible warranty claims.

Exclusive repair or replacement warranties are, of course, permissable under the Code. § 42a–2–719 provides:

> (1) subject to the provisions of subsections (2) and (3) of this section and of the preceding section on liquidation and limitation of damages, (a) the agreement may provide for remedies in addition to or in substitution for those provided in this article and may limit or alter the measure of damages recoverable under this article, as by limiting the buyer's remedies to ... repair and replacement of non-conforming goods or parts; and (b) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

However, the section continues stating:

> (2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this title.

As subsection (2) and the cases make clear, where the remedy agreed to be the sole remedy cannot yield the relief it purports to give, and thus cannot accomplish its essential purpose of providing at least a minimum adequate remedy, then the buyer is entitled to pursue any of the other available remedies provided by the Code as though the language of the contract limiting the buyer's remedy had never existed. *Conte,* 172 Conn. at 123, 374 A.2d 144. *See Beech Aircraft Corp. v. Flexible Tubing Corp.,* 270 F.Supp. 548, 564 (D.Conn.1967) (the repair or replacement remedy must be effective under Connecticut law or the Court will not be bound by its terms). The comments to § 42a–2–719 expand on this principle, stating:

> 1. Under this section parties are left free to shape their remedies to their particular requirements and reasonable

agreements limiting or modifying remedies are to be given effect.

> However, it is of the very essence of a sales contract that at least minimum adequate remedies be available. If the parties intend to conclude a contract for sale within this Article they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract. Thus any clause purporting to modify or limit the remedial provisions of this Article in an unconscionable manner is subject to deletion and in that event the remedies made available by this Article are applicable as if the stricken clause had never existed. Similarly, under subsection (2), where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article.

*See Conte,* at 123, 374 A.2d 144. The Court, as it must, adopts this provision as the standard against which the warranty provision of the sales agreement must be compared. Here, the Court's first task is to determine whether the contract provides an obligation or duty on the part of the Seller with regard to any defective goods. If so, the Court's second task under the circumstances presented is to determine if the remedial provision at issue was fair and reasonable, but, because of the circumstances, failed to supply the remedy it purports to give. In the alternative, the Court must consider if the contract provision at issue operates to deprive either party of the substantial value of its bargain.

▮ The repair or replacement warranty offered by UTI is prefaced with the guarantee that "the goods sold hereunder will be free from defects in material and manufacture...." It is beyond doubt that this affirmation creates an express obligation to deliver goods free from defects in material and manufacture. § 42a–2–313 provides:

> (1) Express warranties by the seller are created as follows: (a) *Any* affirma-

tion of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(emphasis added). The affirmation that the helicopter would be free from defects obviously relates to the goods. The Court may assume for the purposes of this motion that the affirmation of defect-free goods formed the basis of the bargain. Accordingly, the guarantee that the helicopter would be defect-free is an express warranty, and as such created an obligation on the part of the seller to conform thereto.

■ Having determined for the purposes of this motion that UTI owed a duty to deliver a defect-free product, the Court turns to its second task: the determination as to whether the remedial provisions were fair and reasonable, but that under the circumstances, the provisions failed to give the fair quantum of remedy owed by virtue of the contractual obligation to deliver a defect-free product. Here the Court must look to the specific language of the agreement in making its determination. The provision provides for the repair or replacement, at the seller's option, of defective parts, provided such defects are brought to the seller's attention within 90 days after the first operation of the product by the buyer. Thus, under the contract, the buyer's remedy upon discovering a defect is to notify the seller and ship the defective part back to the seller for its repair or replacement. If the defect were obvious, or manifested itself within 90 days, the buyer would have a complete remedy. However, if the defect were latent, as is alleged here, and failed to manifest itself within the 90 day period, the buyer is left without any remedy at all.

Comind claims that the inner race was made of a material of inadequate strength, or was improperly made, and/or was improperly installed. The evidence submitted for the purposes of this motion supports one or more of these claims. Thus, the helicopter may have been delivered in a defective state. UTI may have certain defenses to this claim, such as that the buyer knew or should have know of the defect but neglected to do anything about it, or that the accident was caused by some other circumstance and the part was not defective at all. However, if Comind's claims are correct, if the defect was latent and not reasonably discoverable within the 90 day period, then the sole remedy provided for in the sales contract could be claimed to be wholly inadequate to support the obligation of the seller to deliver a defect-free product. While the contractual remedy may well have been adequate under normal circumstances, its provisions left VOTEC out in the cold with regard to latent defects and thus could be claimed to have failed of its essential purpose, namely to support the defect guarantee.

In addition, this provision, under the circumstances, could be claimed to have deprived VOTEC of the substantial value of its bargain. VOTEC bargained for a defect-free helicopter. This was guaranteed in the contract. However, the remedial provisions may prevent the buyer from claiming a remedy to assure it the full value of the guarantee. Again, assuming the scenario outlined above, the remedial provisions, by failing to account for latent defects, could be claimed to have left VOTEC without a remedy.

Additional considerations raise further doubts about the validity of the contract's remedy limitation. These revolve around the troublesome ambiguity at the heart of the contract's remedial conflict. The first sentence of § 1(a) warrants against all defects. The second sentence in effect revokes this warranty for latent defects not discovered or reasonably discoverable within 90 days of delivery. As one court has stated in a remarkably similar case,

An attempt to both warrant and refuse to warrant goods creates an ambiguity which can only be resolved by making one term yield to the other.... Section [42a-] 2–316 ... of the ... Code provides that warranty language prevails over the

disclaimer if the two cannot be reasonably reconciled.

*Wilson Trading Corp. v. David Ferguson, Ltd.*, 23 N.Y.2d 398, 297 N.Y.S.2d 108, 113, 244 N.E.2d 685 (1968) (citations omitted). In the instant controversy, the Court is presented with a problem of irreconcilable terms. Because the Code adopts a preference for warranty and remedy over no warranty and no remedy, the plaintiff may be entitled to claim that the defect guarantee embodied in the first sentence of § 1(a) should prevail and should be given effect. *See* §§ 42a–2–316 (warranty provisions prevail over irreconcilable warranty limitations or negations), 42a–2–719, comment 1 (the aggrieved party is entitled to a fair quantum of remedy to support a warranty), and § 42a–1–106 (the remedial provisions of the code are to be liberally administered); and *Conte*, 172 Conn. at 123, 374 A.2d 144 (citing and applying § 42a–2–719, comment 1).

Based upon the foregoing analysis, the Court finds that the contract's remedial provision may have failed of its essential purpose, thus becoming inoperative if such is the case. Comind is therefore entitled to its day in court to attempt to prove that the helicopter in question was defective and that UTI breached its obligations under the agreement. Accordingly, the defendants' motion for summary judgment with regard to the issue of contractual liability is denied. Based upon the foregoing, the Court need not decide if the particular provision at issue was unconscionable pursuant to § 42a–2–302, or whether the 90 day limitation posed an unreasonable time restraint on the defendant's right of revocation pursuant to § 42a–2–608, comment 4 (incorporating by reference § 42a–2–602, comment 1).

#### The Agreement's Monetary and Consequential Damage Limitation Provision

■ The defendants' disingenuous argument that the plaintiff's remedy is solely limited to the repair or replacement of the defective bearing inner race merits little discussion. If Comind is successful in establishing that the part was latently defective and that the defect was not reasonably discoverable or actually discovered within the 90 day limitation period, thus leaving the buyer without a remedy for latent defects despite the defect guarantee, then the repair or replacement limitation is without effect. However, the defendants' other argument, that their liability is limited to $100,000.00, merits further consideration.

■ The provision at issue here, pursuant to which the defendants' claim a liability ceiling of $100,000.00, states,

The sum of One Hundred Thousand Dollars ($100,000.00) with respect to any helicopter or parts purchased under this Agreement and alleged to be the cause of any loss or damage to the Buyer shall be the ceiling limit on Seller's liability, whether founded in contract or tort (including negligence), arising out of, or resulting from (i) this Agreement or the performance or breach thereof, (ii) the design, manufacture, delivery, sale, repair, replacement, or (iii) the use of any such helicopter or the furnishing of any such parts. In no event shall the Seller have any liability for any incidental or consequential damages.

§ 6. The defendants seek a determination that this limitation is valid and enforceable. Comind argues that it is neither. The Court turns to the applicable provisions of the Code to resolve this dispute.

The Court's analysis of this issue begins with consideration of § 42a–2–718, entitled "Liquidation or limitation of damages", which provides in pertinent part:

(1) Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or non-feasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty.

The official comments explain further, stating:

1. Under subsection (1) liquidated damage clauses are allowed where the amount involved is reasonable in the light of the circumstances of the case. The subsection sets forth explicitly the elements to be considered in determining the reasonableness of a liquidated damage clause. A term fixing unreasonably large liquidated damages is expressly made void as a penalty. An unreasonably small amount would be subject to similar criticism and might be striken under the section on unconscionable contracts or clauses.

§ 42a–2–718, comment 1. *See Stock Shop, Inc. v. Bozell & Jacobs, Inc.*, 481 N.Y.S.2d 269, 270–71, 126 Misc.2d 95 (1984) (liquidated damage clause held void as a penalty). *See also* §§ 42a–1–106 and 42a–2–316(4) (remedies may be limited in accordance with § 42a–2–718). Whether or not the $100,000.00 limitation is reasonable is a question of fact. However, as mentioned before, the helicopter in question cost approximately $1,600,000.00, and was entirely destroyed in the accident. Assuming that this amount is the plaintiff's actual loss (although they claim a much higher figure); and assuming that the defendants are liable for breach of warranty under the analysis undertaken in the previous section of this ruling, then the plaintiff will have established one of the elements necessary for a showing that the $100,000.00 figure was unreasonable within the meaning of § 42a–2–718. *See Equitable Lumber Corp. v. IPA Land Development Corp.*, 38 N.Y.2d 516, 381 N.Y.S.2d 459, 462–63, 344 N.E.2d 391, 395 (1976) (unreasonable liquidated damage amounts are impermissable under the Code).

The other elements that Comind may need to address are whether the loss was difficult to anticipate and prove, and whether an adequate remedy was inconvenient or non-feasible. The defendants have failed to establish that Comind cannot adequately address these issues, nor have the defendants conclusively established the validity of the $100,000.00 limitation. Accordingly, Comind must be permitted the opportunity to demonstrate the unreasonableness of the $100,000.00 limit, if it can.

In addition, given the gross disparity between the cost of the helicopter and the liquidated amount, the limitation on liability clause may be unconscionable pursuant to § 42a–2–302. *See Equitable Lumber Corp.*, 381 N.Y.S.2d 464, 344 N.E.2d at 396. Although unconscionability is a matter for the Court to decide, § 42a–2–302, comment 1, the plaintiff has not moved the Court to consider this possibility, and the Court declines to consider it at this time in this disposition of the defendants' motion. The Court does agree, however, that the defendants have failed to establish that the plaintiff lacks a valid unconscionability claim. The plaintiff is entitled to make such a claim if it so choses.

■ The same analysis would also apply if the defendants sought to invoke the contract's disclaimer of consequential damages clause, rather than the $100,000.00 monetary limitation, to limit their exposure. Here the Court focuses on the last sentence of § 6 of the sales agreement which provides: "[i]n no event shall the Seller have any liability for any incidental or consequential damages." In considering the validity of this absolute limitation, the Court turns first to § 42a–2–715, entitled "Buyer's incidental and consequential damages," which provides:

> (2) Consequential damages resulting from the seller's breach include ... (b) injury to person or property proximately resulting from any breach of warranty.

As explained in the official comments:

> [w]here the injury involved follows the use of goods without discovery of the defect causing the damage, the question of 'proximate cause' turns on whether it was reasonable for the buyer to use the goods without such inspection as would have revealed the defects.

§ 42a–2–715, comment 5. Comind's loss of the helicopter itself could be characterized as "consequential damages". As such, if the consequential damage limitation were valid, Comind might be entitled to recover nothing. However, similar to the analysis

applied to the $100,000.00 limitation, the consequential damage disclaimer is subject to the limitations imposed by §§ 42a–2–718(1), 42a–2–719(3), and 42a–2–302. *See* § 42a–2–316(4) ("[r]emedies for breach of warranty can be limited in accordance with the provisions of section 42a–2–718 on liquidation or limitation of damages and section 42a–2–719 on contractual modification of remedy"). Because the validity of this disclaimer is in serious doubt, it would be highly inappropriate to uphold the defendants' claim that they have no liability for the purposes of this motion.

In light of the foregoing, the Court finds that the defendants are not entitled to summary judgment on the issue of the validity of their limitation on liability provision with regard to the plaintiff's warranty claims.

## The Plaintiff's Tort Claims

The defendants argue as additional grounds for summary judgment that Comind's negligence and products liability claims are not tenable for a variety of reasons. First, the defendants argue that the plaintiff's negligence and products liability claims fall within the Court's admiralty jurisdiction, and that admiralty does not recognize the type of loss claimed by the plaintiff. Second, the defendants argue in the alternative that the contractual tort disclaimers embodied in the sales agreement are valid and bar any recovery as a matter of state law. The Court finds, however, 1) that admiralty law recognizes the type of claim presented by the plaintiff under the facts of this case; 2) that admiralty law is not a bar to the plaintiff's supplemental state law claims; and 3) that the disclaimer provisions are invalid, in part, against the plaintiff's claims.

## Admiralty Jurisdiction and Actions in Admiralty

The Court finds that it has jurisdiction in admiralty over Comind's tort claims pursuant to 28 U.S.C. § 1333. This case involves the crash of a helicopter into the Atlantic ocean off the coast of Brazil. The helicopter in question was used to ferry passengers and supplies to and from offshore drilling structures. The crash of this helicopter under these circumstances bears a sufficiently significant relationship to traditional maritime activity to support jurisdiction under § 1333. *Ledoux v. Petroleum Helicopters, Inc.,* 609 F.2d 824, (5th Cir.1980), *reh. denied,* 612 F.2d 579 (5th Cir.1980). *See Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 261, 93 S.Ct. 493, 501, 34 L.Ed.2d 454 (1972) (the proper test applicable to determine jurisdiction in admiralty is whether the wrong alleged bears a significant relationship to traditional maritime activity). The defendants argue, however, that admiralty law does not recognize the plaintiff's tort claims. The Court disagrees.

In *East River Steamship Corp. v. Transamerica Delaval Inc.,* 476 U.S. 858, ——, 106 S.Ct. 2295, 2299, 90 L.Ed.2d 865 (1986), the Supreme Court recognized products liability actions as part of the general maritime law. The Court previously incorporated negligence actions in *Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. 625, 632, 79 S.Ct. 406, 410, 3 L.Ed.2d 550 (1959). However, as the holding in *East River Steamship* makes clear, not all types of negligence or products liability claims are cognizable under admiralty law.

In *East River Steamship,* the Court considered whether liability should be imposed as a matter of general maritime law in three paradigmatic situations: First, in cases where the defective product malfunctions and inflicts personal injury on a user or third party; second, in cases where the defective product malfunctions and could have inflicted injury on a user or third party but did not (the "near-miss" scenario); and third, where the defective product malfunctions but poses no threat of physical injury to users or third parties (the "disappointed but unharmed" user scenario). The Court held that liability in admiralty under either negligence or products liability could only be imposed in the first paradigm. *Id.* at —— – ——, 106 S.Ct. at 2302. The Court specifically reserved judg-

ment, however, on the issue of whether a tort victim could recover purely economic damages. *Id.* at ——, n. 6, 106 S.Ct. at 2302, n. 6. However, for the reasons identified in the Supreme Court's ruling in *East River Steamship,* and for the reasons articulated in the cases relied on by the Supreme Court in that ruling, the Court finds that the economic damages claimed by the plaintiff are recoverable if the accident in general falls within the first paradigm outlined above.

■ Adopting the holding in *East River Steamship,* the Court finds that the accident involving the helicopter at issue here falls within the first category of paradigmatic cases, and thus is cognizable in admiralty. Because lives were lost in the accident allegedly due to a defect in the bearing inner race, Comind's claim is not fundamentally an action for economic damages only. The plaintiff's claim arises from the same accident that took the lives of the helicopter's passengers and crew. Accordingly, the plaintiff is not barred from bringing its tort claims in admiralty.

The Court therefore denies the defendants' motion for summary judgment on this issue. Additionally, because the issue was not raised by either side, the Court reserves judgment on the question of whether the sales agreement's disclaimer provisions bar recovery in admiralty on the plaintiff's negligence and products liability claims. This issue may be raised at a later date.

### The Plaintiff's State Law Claims

■ The defendants next contend that admiralty law preempts Comind's substantive state law tort claims. The express language of 28 U.S.C. § 1333, however, counsels otherwise. The provision states:

The district courts shall have original jurisdiction, exclusive of the courts of the States, of:

(1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in *all* cases *all* other remedies to which they are *otherwise* entitled.

(emphasis added). As this section and the cases make clear, diversity and admiralty jurisdiction are not mutually exclusive jurisdictional underpinnings. *Gulf Oil Trading Co. v. Creole Supply,* 596 F.2d 515, 520 (2d Cir.1979). A plaintiff asserting admiralty jurisdiction may pursue supplemental remedies afforded under otherwise applicable state law provided the state law remedies are not irreconcilable with federal law. *Kossick v. United Fruit Co.,* 365 U.S. 731, 738–40, 81 S.Ct. 886, 892–93, 6 L.Ed.2d 56 (1961). The decision in *Kossick* makes it clear that the mere fact that the state provides a remedy unavailable under admiralty law is not grounds for denying the state remedy. *Id.* at 739, 81 S.Ct. at 892. Accordingly, maritime litigants may generally pursue preferable common law remedies in addition to those available under substantive admiralty law. *Pacific Far East Line, Inc. v. Ogden Corp.,* 425 F.Supp. 1239, 1243 (N.D.Cal.1977).

In this case, the plaintiff's asserted state law remedies are not expressly preempted by any federal Act. *See Offshore Logistics Inc. v. Tallentire,* 477 U.S. 207, —— ——, 106 S.Ct. 2485, 2492, 91 L.Ed.2d 174, (1986) (federal wrongful death statutes preempt state wrongful death causes of action in certain situations; preserving such state actions in other situations). In addition, no conflict exists between the asserted state law remedies and the federal interests undergirding admiralty law in general. Accordingly, the defendants' reliance on their preemption theory is misplaced. The Court finds that, because admiralty jurisdiction is not exclusive; because admiralty law does not preempt Comind's state law claims under the circumstances of this case; and because this Court would otherwise have proper jurisdiction to hear Comind's state law claims under 28 U.S.C. § 1332, Comind is entitled to pursue its valid state law tort causes of action in addition to its valid admiralty law claims.

### The Plaintiff's Negligence and Strict Liability Claims

Because the plaintiff's state law tort remedies remain available to it, the Court

turns to that part of the defendants' motion requesting summary judgment regarding the validity of their tort liability disclaimers under state law. The defendants seek a ruling that they cannot have any liability for any of the plaintiff's tort claims because of the contractual provisions of their sales agreement. The Court finds that provisions limiting liability in tort are generally disfavored, and that, with regard to the contract's purported bar of Comind's strict liability claim, the provision is of no effect as a matter of law. With regard to contract's disclaimer of liability for negligence, however, the Court finds that factual issues remain and must be resolved before the Court may pass on the validity of this particular provision.

## Choice of Law

Before discussing the issue of whether or not Connecticut law sanctions the tort disclaimers in the UTI–VOTEC sales agreement, the Court addresses the problem of whether Connecticut law applies at all to these claims. The accident from which this controversy arose occurred off the coast of Brazil. Connecticut's tort choice-of-law rules, which this Court must apply, *Klaxon Co. v. Stentor Electric Manufacturing Co., Inc.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), formerly embodied a lex loci delicti approach. This doctrine was recently abandoned in favor of the choice of law rules promulgated in the Restatement, Second, Conflicts of Laws. *O'Connor v. O'Connor*, 201 Conn. 632, 648–50, 519 A.2d 13 (1986).

Under the Restatement approach adopted in *O'Connor*, the Court's choice of law analysis becomes a somewhat complex balancing task. The Court begins its analysis with § 145(1), which provides:

'[t]he rights and liabilities of the parties with respect to an issue are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.'

*O'Connor*, 201 Conn. at 650, 519 A.2d 13 (quoting 1 Restatement, Second, Conflicts of Law § 145(1)). Turning to § 6:

'the factors relevant to the choice of the applicable rule of law include (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.'

201 Conn. at 651, 519 A.2d 13 (quoting 1 Restatement, Second, Conflicts of Law § 6). Further assistance is supplied by § 145(2) which provides:

'[c]ontacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil [sic], residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered. These contacts are to be evaluated according to their relative importance with respect to the particular issue.'

201 Conn. at 652, 519 A.2d 13 (quoting 1 Restatement, Second, Conflicts of Law § 145(2)). Some of the facts necessary to the Court's proper resolution of the choice of law issue appear on the record. Other important facts, however, are missing, rendering a final resolution inappropriate at this time. For the purposes of this motion the Court will assume that the plaintiff's assertion that Connecticut law applies is correct.

## Connecticut's Procedural Limitations on Products Liability Claims

The Court initially recognizes that the plaintiff's cause of action arose after Octo-

ber 1, 1979 as a products liability claim within the meaning of C.G.S.A. § 52–572m(b), and is therefore governed by the provisions of § 52–572*l*–r. Pursuant to § 52–572n(a) the plaintiff must plead its claims of negligence, warranty, and strict liability as a single consolidated products liability claim. *Daily v. New Britain Machine Co.*, 200 Conn. 562, 571–72, 512 A.2d 893 (1986). *See Collucci v. Sears, Roebuck & Co.*, 585 F.Supp. 529, 532, (D.Conn.1984) (plaintiffs are supposed to plead a single consolidated claim, but the fact that they haven't does not preclude them from consolidating their claims at a later date, without prejudice, under the federal rules). Because this issue has not been raised by either side, the Court expresses no opinion on the plaintiff's failure to consolidate its claims in accordance with § 52–572n.

The Court takes note of C.G.S.A. § 52–572n(c), which states:

> As between commercial parties, commercial loss caused by a product is not harm and may not be recovered by a commercial claimant in a products liability claim [which, pursuant to subsection (a), includes a claim for negligence]. An action for commercial loss caused by a product may be brought only under, and shall be governed by, title 42a, the Uniform Commercial Code.

However, this subsection did not take effect until June 14, 1984, long after the filing of this case. It is therefore inapplicable to this controversy. *Cersosimo v. Cersosimo*, 188 Conn. 385, 400–01, 449 A.2d 1026 (1982). *See Collucci*, 585 F.Supp. at 531–32 ("substantive rights may not be amended retrospectively by legislative enactment").

Connecticut's statutory products liability provisions do not create or abolish any of the plaintiff's causes of actions (apart from § 52–572n(c) which is excepted). They merely force the plaintiff to consolidate its claims into a single products liability claim, and provide such other rules as a uniform statute of limitations applicable to all of the plaintiff's theories. Moreover, they do not provide substantive rules regarding the is-

sue of whether negligence or strict liability disclaimers are valid or enforceable in Connecticut. To resolve these issues, the Court must look to Connecticut's substantive tort liability law.

### Negligence Disclaimers

The defendants claim that the negligence liability disclaimer in the UTI–VOTEC sales agreement is valid and enforceable. The plaintiff disagrees and cites several Connecticut decisions which support its argument that such disclaimers are generally found invalid as contrary to public policy. The Court finds, however, that while these decisions establish the general principle that Connecticut law strongly disfavors such disclaimers, the Court also finds that the Connecticut courts have adopted a case-by-case approach when faced with challenges to the validity of such disclaimers and that the decisions cited by the plaintiff, none of which involve transactions between commercial parties, do not necessarily govern the present controversy.

The plaintiff relies principally on *Malone v. Santora*, 135 Conn. 286, 64 A.2d 51 (1949), to support its claim that the negligence disclaimer in this case is unenforceable as a matter of law. In *Malone*, the Connecticut Supreme Court refused to enforce a negligence disclaimer provision in a parking lot bailment contract stating that, under the circumstances of that case, the provision was "'revolting to the moral sense, and contrary alike to the salutary principles of law and a sound public policy.'" *Id.* at 293, 64 A.2d 51 (quoting *Welch v. Boston & A.R. Co.*, 41 Conn. 333, 342 (1874)). The lower courts in Connecticut have reached similar conclusions in other contexts. *See Fedor v. Mauwehu Council*, 21 Conn.Supp. 38, 40–41, 143 A.2d 466 (1958) (refusing to enforce a summer camp's written negligence disclaimer); *Parillo v. Housing Authority of the City of New Haven*, 16 Conn.Supp. 106, 107 (1949) (refusing to enforce a landlord's liability disclaimer covering the landlord's negligent failure to repair a dwelling). *See*

*also* C.G.S.A. § 52–572k (hold harmless clauses are unenforceable as contrary to public policy in certain construction contracts).

The plaintiff also cites *Rodriguez v. Gilbertie*, 33 Conn.Supp. 582, 363 A.2d 759 (Conn.App.1976), in support of its claim. There, the Connecticut Court of Appeals refused to enforce a provision limiting liability to the express provisions contained in a warranty deed. In *Rodriguez*, the controversy centered on a negligently installed septic system, and the court, citing *Malone*, went so far as to state that were negligence was concerned, "a party cannot by contract relieve himself of such liability." *Id.* at 584–85, 363 A.2d 759. This Court can find little reason to doubt that the holding in *Rodriguez* correctly states the proper result that should obtain in the present controversy with regard to the enforceability of the defendants' negligence disclaimer. However, despite the general difficulties such provisions have encountered with the courts, negligence disclaimers have not been categorically denounced by the Connecticut Supreme Court or by the legislature, and, as before mentioned, the cases cited above demonstrate that Connecticut courts have tended to take a case-by-case approach. Therefore the Court awaits better resolution of the factual issues of this case before determining if the negligence disclaimer in the present controversy is unenforceable. Because the disclaimer may be invalid, however, the defendants' motion for summary judgment with regard to this issue is denied.

*Strict Products Liability Disclaimers*

■ Disclaimers of strict products liability in tort stand on somewhat of a different footing than disclaimers for negligence due to the acute differences in the natures of these very dissimilar theories of liability. *See Giglio v. Connecticut Light & Power*, 180 Conn. 230, 234, 429 A.2d 486 (1980) (listing the requirements for recovery under strict liability theory). As the Connecticut Supreme Court has pointed out, strict products liability is entirely independent from any liability or allocation of risk created by contract and is not governed by contractual creations. *Rossignol v. Danbury School of Aeronautics, Inc.*, 154 Conn. 549, 559–60, 227 A.2d 418 (1967) (citing 2 Restatement, Second, Torts § 402A comment m). Accordingly, a manufacturer's contractual disclaimer should have no effect on an appropriate party's products liability claim.

In Connecticut, prior to the enactment of C.G.S.A. § 52–572n(c) (which does not apply retroactively to this case), strict products liability actions were permissible between commercial parties. *See Coe-Park Donuts, Inc. v. Robertshaw Controls Co.*, 1 Conn.App. 84, 86–87, 468 A.2d 292 (Conn. App.1983) (suit for damages arising from a defective thermostat). In such cases, the strict products liability doctrine has been applied unchanged from its non-commercial context. *See Id.* at 86, 468 A.2d 292. Absent any indication from the Connecticut Courts that general contract principles underlying liability disclaimers (which in the negligence context are disfavored) are applicable in strict products liability situations, this Court is unwilling sua sponte to inject this alien legal theory into Connecticut's tort-based strict products liability law. The realms of contract and strict tort liability are conceptually and legally distinct, and the Court rejects the defendants' attempt to comingle the two.

Because the defendants' disclaimer argument is inapposite in the context in which they seek to make it, it is of no effect with regard to Comind's products liability claim. *See Rossignol*, 154 Conn. at 559–60, 227 A.2d 418. The defendants' motion for summary judgment on this issue is therefore denied.

*Conclusion*

For the foregoing reasons, the defendants' motion for summary judgment is granted on the issues of agency; the motion is denied in all other respects.

SO ORDERED.

## MEMORANDUM OF DECISION FOLLOWING THE DEFENDANTS' MOTION FOR RECONSIDERATION

The defendants, United Technologies Corporation (UTC) and United Technologies International, Inc. (UTI) have moved for reconsideration of this Court's decision, dated January 14, 1987, regarding their motion for summary judgment which was granted in part and denied in part. The motion for reconsideration was filed on January 29, 1987, and was granted on February 2, 1987. The defendants claim they have no quarrel with much of the Court's decision, including all of the Court's analysis of the agency and contract issues. However, the defendants object to various aspects of the Court's analysis regarding the plaintiff's tort claims. However, having carefully considered the defendants' arguments, the Court finds that there is no basis for the claim that the Court's previous ruling was in error.

### Facts

The facts of this case are fully set forth in this Court's previous memorandum of decision.

### Discussion

Contrary to the Court's earlier ruling, the defendants claim 1) that there can be no tort recovery in admiralty under the facts presented; and 2) that state law does not provide a permissible alternative remedy for the plaintiff. The Court addresses the defendants' claims seriatim.

### Tort Liability in Admiralty

The defendants cite the Supreme Court's recent decision of *East River Steamship Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), for the proposition that, in admiralty, where a product has failed and has killed its several passengers in the process, the party possessing the economic interest in the product is not entitled to recover in tort against the tortfeasor for its economic loss. The defendants argue in support of this proposition that the disposition of all

"purely economic" interests in such situations is properly and exclusively controlled by principles of contract law.

The defendants' characterization of Comind's loss as a "purely economic interest" underscores their effort to define the issues in this motion in purely contractual terms. Viewed from the perspective the defendants prefer, VOTEC's loss of the helicopter has caused Comind to incur a financial liability. However, viewed from a tort perspective, because the loss of the helicopter also occasioned the loss of several lives, it is far more than an economic casualty.

At the outset it is important to emphasize that contract and tort theories are fundamentally dissimilar. Because certain of the distinctions that differentiate tort from contract are significant in the Court's resolution of the issues presented, the Court takes this opportunity to discuss these distinctions at some length.

Parties entering into a contractual relationship are fundamentally responsible for designing the warranties that anticipate liability in the event of certain contingencies. Warranty design is also, in part, controlled by the forces of public policy as embodied in such enactments as the Uniform Commercial Code. Such enactments, to a certain extent, regulate how contracting parties may allocate liability among themselves, but they typically fall short of rigidly imposing liability as a matter of course. This in itself reveals a fundamental preference of contract law, one that encourages the parties to allocate bargained for, and sometimes unbargained for, risks and liabilities as their own needs and preferences require. Warranty liability, as fundamentally a creation of agreement, is thus a flexible instrument of risk allocation which the parties may manipulate in accordance with their own desires and skill.

Negligence and strict products liability theories, on the other hand, are entirely different creations. They are fundamentally the creatures of public policy. The basic focus of their application, particularly that

of strict products-liability, is upon conduct which inflicts personal injury. Whereas contract speaks of the creation of duties between individuals entering into a relationship of their choice, tort speaks of duties imposed by society in an effort to deter certain types of conduct and to provide remedy for certain types of abuses or injuries. Because tort law ostensibly applies to everyone with equal force, it is perceived as a relatively rigid and inflexible system in comparison to the relative freedom associated with the process of contractual risk-taking and risk-avoidance. The two are thus natural ideological rivals.

In seeking relief from tort liability, the defendants point to the fact that they entered into a contractual relationship with the plaintiff's insured. This relationship is memorialized in a document which the defendants rely on for the proposition that all rights and liabilities stemming from the transaction are governed by it, including rights and tort liabilities arising from the alleged accident. First, from a tort perspective, the rights and liabilities arising from the accident do not depend on what the contract says, but rather flow from what the rules of tort provide. Since the defendants seek exemption from tort liability, reference to contracts principles is inapposite. The Court must here consider whether tort law itself is capable of swallowing the defendants' liability exemption theories.

Second, from a contracts perspective, the document the defendants rely on is itself, in many respects, probably wholly useless to satisfactorily dispose of the rights and liabilities of the parties. To admit of a preemption under the facts presented here would be highly troublesome since the product of the parties supposedly thorough contractual negotiations (allegedly drafted in compliance with the requirements of contract law) is the ambiguous and possibly unconscionable document presented to the Court. From a purely rational perspective, the defendants' reliance on the contract for the support they claim it yields would appear to be unsound.

Nevertheless, the defendants argue strenuously that the suspect contract is the sole repository of the plaintiff's rights in admiralty for their claim of economic loss. They warn that, if they are not permitted to be exempt from tort liability for "economic lossess" under the circumstances presented, then their ability to draft meaningful warranties will be destroyed. They caution that, if their theory does not prevail, warranty law risks "drowning in a sea of tort."

The defendants' claim that warranty law becomes meaningless when tort allows for the recovery of economic loss between commercial parties is neither novel nor accurate. This argument assumes that tort theory imposes liability in all situations where warranty is capable of excluding it. Such is clearly not the case. The nexus of facts surrounding a product's failure may or may not include factors that establish a breach of warranty, and may or may not include factors that establish a cause of action in tort. The two embody fundamentally different inquiries and are clearly not mutually coextensive or exclusive.

In addition, the Court does not address the question of the imposition of liability for economic loss where the accident giving rise to the loss did not also result in the death of several persons. It is clear that where the accident did not result in physical injury but only in damage or destruction to the product itself, warranty, as between commercial parties, governs exclusively in admiralty; and tort liability for the economic loss is exempted. *East River Steamship*, at —, 106 S.Ct. at 2300–04. Thus the Court addresses the viability of warranty *only* in the context of a possible impermissable intrusion of tort law when the product injures, maims, or kills an individual or group of individuals in addition to destroying itself. Thus it cannot be said under the circumstances that the Court in general risks drowning warranty law "in a sea of tort" by entertaining the imposition of tort liability in such a narrow category of cases. On the contrary, the Court perceives that to follow the defendants' reasoning is to

proceed towards a very different disaster: one in which tort liability would founder in a sea of contractual disclaimers.

At this point the Court turns to the specifics of the Supreme Court's holding in *East River Steamship*, and its own ruling of January 14. In its previous ruling the Court rendered the following interpretation:

> In *East River Steamship*, the Court considered whether liability should be imposed as a matter of general maritime law in three paradigmatic situations: First, in cases where the defective product malfunctions and inflicts personal injury on a user or third party; second, in cases where the defective product malfunctions and could have inflicted injury on a user or third party but did not (the "near-miss" scenario); and third, where the defective product malfunctions but poses no threat of physical injury to users or third parties (the "disappointed by unharmed" user scenario). The Court held that liability in admiralty under either negligence or products liability could only be imposed in the first paradigm. *Id.* at ———-———, 106 S.Ct. at 2302. The Court specifically reserved judgment, however, on the issue of whether a tort victim could recover purely economic damages. *Id.* at ——, n. 6, 106 S.Ct. at 2302, n. 6. However, for the reasons identified in the Supreme Court's ruling in *East River Steamship*, and for the reasons articulated in the cases relied on by the Supreme Court in that ruling, the Court finds that the economic damages claimed by the plaintiff are recoverable if the accident in general falls within the first paradigm outlined above.

Adopting the holding in *East River Steamship*, the Court finds that the accident involving the helicopter at issue here falls within the first category of paradigmatic cases, and thus is cognizable in admiralty. Because lives were lost in the accident allegedly due to to a defect in the bearing inner race, Comind's claim is not fundamentally an action for economic damages only. The plaintiff's claim arises from the same accident that took the lives of the helicopter's passengers and crew. Accordingly, the plaintiff is not barred from bringing its tort claims in admiralty.

The defendants quarrel with this interpretation for a number of reasons, none of which have merit.

 The defendants begin with the argument that *East River Steamship* stands for the proposition that economic injury is never recoverable in admiralty for tort-based claims, even when the accident giving rise to the claim also took the lives of several human victims. *East River Steamship*, however, does not say this. First, the specifics of the Court's holding are that "a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself." *Id.* 106 S.Ct. at 2302. Rightfully so as an economic obligation to ensure mere satisfactory product performance is best governed by the salutary principles of warranty. However, in the present case, the product not only allegedly destroyed itself, but took with it the lives of its passengers and crew. Thus the duty implicated here is the quite different responsibility to manufacture a reasonably safe product, not merely an obligation defined by the contract to ensure that the product functions in the bargained-for manner.

In its tort-versus-warranty analysis, the Court stated "[w]hen a product injures only itself the reasons for imposing a tort duty are weak and those for leaving the party to its contractual remedies are strong." *Id.* at ——, 106 S.Ct. at 2302. The Court added that "[t]he tort concern with safety is reduced when an injury is only to the product itself." *Id.* at ——, 106 S.Ct. at 2302. Again, the accident helicopter in this case not only destroyed itself but also killed its occupants. Thus, the concern with safety becomes an issue of paramount importance, and the reasons for imposing tort liability are overwhelming.

Accordingly, while it is true that situations involving near-misses or disappointed

users may not properly give rise to cognizable tort claims in admiralty, situations involving personal injury as a result of product defect lie at the very heart of negligence and strict products-liability concerns.[1] Parties injured as a result of this latter type of product disaster are entitled to lay full claim to the salutary liability rules embodied in negligence and strict products-liability concepts. Such liability rules are specifically designed to throw moral as well as financial responsibility onto the shoulders of the manufacturer in the hope of providing further incentive for safety-conscious behavior as well as in the attempt to fully remedy the full range of injury inflected by the deadly defect.[2] Thus, for cases falling within the range of the personal injury-causing defect scenario, liability may be imposed for personal as well as economic damages where the duty to manufacture reasonably safe products has been breached under either negligence or strict products-liability rationales. In such situations involving questions of life and death, the superior suitability of tort principles becomes readily apparent.

### Admiralty Jurisdiction and State Law

The Court again construes 28 U.S.C. section 1333, which provides in pertinent part:

The district courts shall have original jurisdiction, exclusive of the states, of: (1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled.

As the Supreme Court's opinion in *Romero v. International Terminal Operating Co.*, 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959), makes perfectly clear, the savings to suitors clause has as its central aim the preservation of the role of the States in the administration of maritime law. *Id.* at 362,

79 S.Ct. at 474. This principle has two ramifications: 1) concurrent state court jurisdiction, *see Madruga v. Superior Court*, 346 U.S. 556, 560, 74 S.Ct. 298, 300, 98 L.Ed. 290 (1954) ("[a]dmiralty jurisdiction is 'exclusive' only as to those maritime causes of action begun and carried on as proceedings *in rem*, that is where a vessel or thing is itself treated as the offender and made the defendant by name or description in order to enforce a lien"); and 2) concurrent application of state law. With regard to the question of the applicability of state law in general, the cases reveal that a plaintiff who properly invokes admiralty jurisdiction may also pursue non-federal, non-admiralty remedies afforded under otherwise applicable state law *provided* the state law remedies are not irreconcilable with federal law *and* the plaintiff would be entitled to them were the case not one in admiralty. Under the facts of the present controversy (subject of course to the complete resolution of such issues as the state choice of law question left open in the Court's previous ruling) the plaintiff is clearly "otherwise entitled" to pursue state law remedies by virtue of 1) state law's recognition of and its applicability to the plaintiff's claims; 2) the plaintiff's legitimate invocation of jurisdiction pursuant to 28 U.S.C. section 1332 (diversity); and 3) the lack of admiralty preemption. With regard to this last issue, the Court reiterates that the mere fact that otherwise applicable state law provides redress unavailable in admiralty is not by itself grounds for denial of the state relief. *Kossick v. United Fruit Co.*, 365 U.S. 731, 739, 81 S.Ct. 886, 892, 6 L.Ed.2d 56 (1961). Because the defendants confuse the manner in which federal law "preempts" state law

---

1. As the Court in *East River Steamship* recognized, "[t]he paradigmatic products-liability action is where a product 'reasonable certain to place life and limb in peril,' distributed without reinspection, causes bodily injury. *Id.* 106 S.Ct. at 2300 (citing *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 389, 111 N.E. 1050, 1053 (1916)).

2. As the Supreme Court further noted, "[t]he manufacturer is liable whether or not it is negligent because 'public policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market.'" *Id.* 106 S.Ct. at 2300 (quoting *Escola v. Coca Cola Bottling Co.*, 24 Cal.2d 453, 462, 150 P.2d 436, 441 (1944) (concurring opinion)).

in admiralty the Court discusses this critical subject at some length.

It is true, of course, that the invocation of admiralty jurisdiction carries with it substantive admiralty law. *East River Steamship*, 106 S.Ct. at 2299. But, as is made abundantly clear in *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 255, 93 S.Ct. 493, 498, 34 L.Ed.2d 454 (1972), substantive admiralty law contains a peculiar "panoply" of principles that are, in many senses, unique in the federal jurisprudence. The defendants' suggestion of a complete eclipse of state law by virtue of the invocation of admiralty does not fit within the general scheme of maritime law, and certainly falls wide of the intent of section 1333.

The defendants' interpretations suggest that principles of admiralty, operating in conjunction with section 1333, function in a manner similar to the way in which federal law "preempts" state law following the invocation of federal question jurisdiction. Although at first blush both admiralty and federal question jurisdiction implicate federal law, they work in remarkably different ways, and they embody fundamentally dissimilar balances of federal/state policy. A contrast between the two is offered in *Romero*.

> [t]he far-reaching extension of national power resulting from the victory of the North, and the concomitant utilization of Federal Courts for the vindication of that power in the Reconstruction Era, naturally led to enlarged jurisdiction of the federal courts over federal rights. But neither the aim of the [Judiciary] Act of 1875 [creating broad federal question jurisdiction] to provide a forum for the vindication of new federally created rights, nor the pressures which led to its enactment, suggest, even remotely, the inclusion of maritime claims within the scope of that statute. The provision of the Act of 1875 with which we are concerned was designed to give a new content of jurisdiction to the federal courts, not to reaffirm one long-established, smoothly functioning since 1789.

*Id.* 358 U.S. at 368, 79 S.Ct. at 478. *Romero* specifically holds that admiralty law is *not* subsumed as a matter of federal question under section 1331 (even though it too is, in "a special sense," a creature of federal law), and is *not* of the same highly preemptive nature (as the savings to suitors clause makes abundantly clear).

Critical to a complete understanding of the interplay of state and federal law in admiralty is the crucial recognition that maritime law seeks to respect and accommodate the regulatory powers of the States to a much greater degree than can be expected from federal question law in general. In the Supreme Court's words,

> [a]lthough the corpus of admiralty law is federal in the sense that it derives from the implications of Article III evolved by the courts, to claim that all enforced rights pertaining to matters maritime are rooted in federal law is a destructive oversimplification of the highly intricate interplay of the States and the National Government in their regulation of maritime commerce. It is true that state law must yield to the needs of a uniform federal maritime law when this Court finds inroads on a harmonious system. But this limitation still leaves the states a wide scope. State-created liens are enforced in admiralty. State remedies for wrongful death and state statutes providing for the survival of actions, both historically absent from the relief offered by the admiralty, have been upheld when applied to maritime causes of action. Federal courts have enforced these statutes. State rules for the partition and sale of ships, state laws governing the specific performance of arbitration agreements, state laws regulating the effect of a breach of warranty under contracts of maritime insurance—all these laws and others have been accepted as rules of decision in admiralty cases, even, at times, when they conflicted with a rule of maritime law which did not require uniformity.

*Id.* at 373–74, 79 S.Ct. at 480–81. (footnotes omitted). Even more telling is the

Court's reference to *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 313, 75 S.Ct. 368, 370, 99 L.Ed. 337 (1955), quoting " '[i]n the field of maritime contracts, as in that of maritime torts, the National Government has left much regulatory power in the States.' " *Romero*, 358 U.S. at 374, 79 S.Ct. at 481. As the *Romero* Court concluded,

> [t]hus, if one thing is clear, it is that the source of law in saving-clause actions cannot be described in absolute terms. Maritime law is not a monistic system. The State and Federal Governments jointly exert regulatory powers today as they have played joint roles in the development of maritime law throughout our history. This sharing of competence in one aspect of our federalism had been traditionally embodied in the savings clause of the Act of 1789.

*Id.* at 374, 79 S.Ct. at 481 (footnotes omitted). *See Kossick v. United Fruit Co.*, 365 U.S. at 739, 81 S.Ct. at 892 ("the process [of applying state and federal law in admiralty] is surely . . . one of accommodation, entirely familiar in many areas of overlapping state and federal concern, or a process somewhat analogous to the normal conflict of laws situation where two sovereignties assert divergent interests in a transaction as to which both have some concern"). It is important to recognize that federal law clearly accepts the important role of state law in admiralty, and, as the cases demonstrate, provides a unique preemption device tailored to suit the precise needs of this acceptance.

▮▮▮▮▮ The Court turns now to consideration of the precise operation of this unique preemption device, or, in other words, the exact manner in which the plaintiff, Comind, is "otherwise entitled" to seek redress under Connecticut's tort law and whether, in fact, admiralty preemption principles come into play at all. First, it is clear that the plaintiff is entitled to pursue its state law claims in admiralty only where the state has a significant and pressing interest in the matter, *East River Steamship*, 106 S.Ct. at 2299 n. 2,[3] and would recognize the claim if the tort had occurred outside the admiralty. See *Romero*, 358 U.S. at 370, 79 S.Ct. at 479 (quoting *Norton v. Switzer*, 93 U.S. (3 Otto) 355, 356, 23 L.Ed. 903 (1876)) (" '[p]arties in maritime cases are not . . . compelled to proceed in the admiralty at all, as they may resort to their common-law remedy in the state courts, or in the [District] Court, if the party seeking redress and the other party are citizens of different states' "). Second, application of state law is not possible if such would disrupt a preexisting rule in admiralty which requires uniformity, *Romero*, at 373–74, 79 S.Ct. at 480–81,[4] or where the plaintiff lacks an independent jurisdictional basis for its state law claims. Again, however, the mere fact that the state provides redress unavailable in admiralty is not, by itself, grounds for denying the state relief.

The Court considers specific analysis of these points in some detail, beginning with consideration of whether the federal negligence and strict products-liability rules announced in *East River Steamship* bar consideration of state tort law theories in admiralty cases. The Court then turns to the question of whether other federal/state conflicts bar the application of state tort theories. Next, the Court examines whether state law would recognize the plaintiff's claim were it brought in state court as a purely a matter of state law, and also whether the plaintiff has an adequate independent jurisdictional basis for its non-federal claims. Finally, the Court addresses the issue of whether the state's interest in policing the conduct of a manufacturer who allegedly builds dangerously defective

---

**3.** *See Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 628, 79 S.Ct. 406, 408, 3 L.Ed.2d 550 (1959) (sole interest lay in application of federal principles embraced in admiralty law, not those of state law).

**4.** *See Madruga v. Superior Court*, 346 U.S. 556, 561, 74 S.Ct. 298, 301, 98 L.Ed. 290 (1954) (state courts exercising concurrent jurisdiction in admiralty may not rework preexisting admiralty law).

products within its jurisdiction constitutes a significant and pressing interest.

As outlined above, the Court in *East River Steamship* stated: "[e]xercising traditional discretion in admiralty ... we ... hold that a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself." *Id.* 106 S.Ct. at 2302. It is difficult to conceive of how a discretionary exercise of authority as a matter of federal law with regard to a contract duty achieves the preemption of a state cause of action based on an entirely different tort obligation. The classification of the cause of action in *East River Steamship* as one sounding in contract, and the classification of the plaintiff's unreasonably dangerous product claims as sounding in tort is no mere technical mincing of words. The accident at issue here falls squarely within the Court's first paradigmatic scenario of tort disaster, and *not* within the near-miss or disappointed user scenarios, matters characterized by the Court as issues best left to contract law. Thus the decision in *East River Steamship* cannot serve as a sound basis for the defendants' preemption theory.

Reaching the next point, the Court finds that the application of state negligence and products liability law under the circumstances of the present case would not create an inroad into the harmonious administration of admiralty law, or contradict an preexisting rule of liability that requires uniformity. *See Madruga v. Superior Court,* 346 U.S. at 562–64, 74 S.Ct. at 301–02 (finding no inroad on federal admiralty law by permitting state courts to apply their own partition rules in the exercise of admiralty jurisdiction). No federal statutory scheme is implicated here.[5] Furthermore, the Court has already found that federal judicial admiralty law recognizes the same type of liability as that imposed by state law under the circumstances of this case. Even if it did not, however, no federal provision can be construed as providing a right to maritime tortfeasors to be exempt from such state liability, and, furthermore, the imposition of such state liability would not be inconsistent with the general tenor of federal law given the salutary principles of public safety already recognized as a matter of federal policy in other contexts.

Reaching the third issue, the Court finds that the plaintiff has properly alleged diversity jurisdiction and, further, that state law would entertain the type of liability contemplated by the plaintiff's tort claims.[6] The plaintiff is, accordingly, entitled to pursue such state law causes of action as the invocation of diversity permits and the recognition of federal law in admiralty does not prevent. *See generally Gulf Oil Trading Co. v. Creole Supply,* 596 F.2d 515, 520 (2d Cir.1979) (diversity and admiralty jurisdiction treated as separate but not mutually exclusive jurisdictional underpinnings); *A & R Marine Salvage, Inc. v. McAllister Lighterage Line, Inc.,* 544 F.2d 551, 553 (1st Cir.1976) ("[a] state court—and, therefore, a federal court sitting in diversity ...—has authority to supplement the remedies available on the admiralty side of a federal court with those customarily administered in that state"); *Beverly Hills National Bank & Trust Co. v. Compania de Navegacione Almirante S.A., Panama,* 437 F.2d 301, 306 (9th Cir.1971),

---

**5.** The decision in *Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986), has no application here given that it discusses the extent to which an express, comprehensive federal statutory scheme preempts state law for accidents occurring on the high seas off the coastal United States.

**6.** *See The Tungus v. Skovgaard,* 358 U.S. 588, 593, 79 S.Ct. 503, 507, 3 L.Ed.2d 524 (1959) (quoting *Garrett v. Moore-McCormack Co.,* 317 U.S. 239, 245, 63 S.Ct. 246, 251, 87 L.Ed. 239

(1942) ("'admiralty courts, when invoked to protect rights rooted in state law, endeavor to determine the issues in accordance with the substantive law of the state'"). Several state law issues material to the proper resolution of the plaintiff's state law tort claims remain open as discussed in this Court's previous ruling. Resolution of these remaining issues one way or the other, however, has no effect on the plaintiff's federal admiralty causes of action sounding in tort.

*cert. denied,* 402 U.S. 996, 91 S.Ct. 2173, 29 L.Ed.2d 161 (1971) (pendant, diversity, and admiralty jurisdiction treated as separate but not mutually exclusive); *Troupe v. Chicago, Duluth & Georgia Bay Transit Co.,* 234 F.2d 253, 258 (2d Cir.1956).

Finally, the interest of the state in applying its laws to police the conduct of manufacturers whose products contain deadly defects is of the utmost importance and is entitled to serious weight. It is axiomatic that a state may provide for a greater quantum of personal safety and protection in the form of liability rules than would the Federal Government in the same context. Indeed, the formulation of such rules is predominantly within the province of state regulatory authority. Where, as here, the defect allegedly causing the loss of life was allegedly created within Connecticut (and only subsequently manifested itself off the coast of Brazil thus allegedly causing the loss of life and also fortuitously giving rise to jurisdiction in admiralty), to ignore substantive state law would be to permit an unwarranted destruction of state authority over tortfeasors acting within its jurisdiction. *See Kossick v. United Fruit Co.,* 365 U.S. at 739, 81 S.Ct. at 892 ("it blinks at reality to assert that because a longshoreman, living ashore and employed ashore by shoreside employers, performs seaman's work, the state, with these contacts must lose all concern for the longshoreman's status and well-being"). *See also Executive Jet Aviation,* 409 U.S. at 273–74, 93 S.Ct. at 506–07 (the fortuitous event of an aircraft's crash into navigable waters is, in a very real sense, a quixotic way of determining applicable law).

█ Accordingly, the Court finds that, under the particular facts of this case, substantive admiralty law permits the application of substantive state negligence and strict products liability theories. In the present controversy, the plaintiff's legitimate state law claims do not create a significant disruption of the harmonious administration of the federal maritime law; in fact, they create no disharmony at all. The Court thus adheres to its previous ruling on these issues.

### Choice of Law

█ In its previous ruling, the Court found that Connecticut law applies an interest-balancing conflicts approach adapted from the Restatement and that this approach is applicable to the state choice of law issues involved in this case. *See O'Connor v. O'Connor,* 201 Conn. 632, 648–50, 519 A.2d 13 (1986). In response, the defendants argue that the Court should nonetheless apply a lex loci delecti standard to the plaintiff's state law tort claims. The defendants' argument is at war with the express language and content of the *O'Connor* decision and is entirely without merit.

### Connecticut Products Liability Law

As the defendants' concede, "harm" recoverable under Connecticut's Products Liability Act includes "damages to property, including the product itself." As the defendants also concede, the limitation of the scope of this Act with regard to commercial parties was not enacted into law until after the instant cause of action arose. Here, there is no clear and unequivocal intent of retroactivity in the amendment, and the presumption that the amendment has prospective effect only must stand. *Canadian Helicopters, Ltd. v. United Technologies Corp.,* case no. 22–65–51 (Conn.Super. Feb. 27, 1987).[7]

With regard to the pleading requirement of C.G.S.A. section 52–572n(a), the fact that the plaintiff has not consolidated its claim into a single products liability matter is of no prejudicial effect. Again, since the issue was not fully briefed and addressed by both sides, the Court expresses no opinion as to whether the plaintiff must conform to Connecticut's statutory pleading require-

---

7. The defendants' argument that this amendment is a mere "clarification" of preexisting law is disengenuous, and must fall under proper application of legitimate retroactivity analysis.

ment in admiralty where the state law causes of action are saved.

*Disclaimer of Products Liability*

The defendants argue that their contractual tort disclaimers are capable of discharging any potential products liability they may have for the allegedly defective helicopter. The Court adheres to its previous ruling with regard to its analysis of the effect of such provisions under state law. The Court does not consider contract and tort principles in isolation, but recognizes that in reality they have significant impact on one another. However, applying Connecticut law to the facts of this case (excluding consideration of section 52–272n(c) which has no retroactive effect), the Court finds that applicable salutary principles of tort law do not permit the defendants to subdue the law of tort through contractual allocation as they they might were 52–272n(c) applicable to this case.

With regard to the defendants' suggestion that federal law does not permit this construction of state law in admiralty, the Court finds that neither side has fully briefed or addressed the full ramifications of tort disclaimers in admiralty, including the issue of whether any preexisting federal tort disclaimer rule overcomes the Court's construction of state law. The Court accordingly reserves judgment on this issue, but intimates that no such preemptive rule exists.

*Conclusion*

For the foregoing reasons, the Court adheres to its previous ruling. The Court also finds that this case is now well-postured for trial on the merits. The Court observes that this matter was originally filed five years ago this week. Although the issues raised are complex, nonetheless the proceedings required to culminate resolution of this matter should commence with all due speed.

SO ORDERED.

